IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

Jo'Von Jordan

    Petitioner,　　　　　　　　　　No. 2:06:cv-01599-MDS

vs.　　　　　　　　　　　　　　　　<u>ORDER</u>

A. Malfi, Warden, et al.

    Respondents.
_____/

    Petitioner Jo'Von Jordan, a state prisoner, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a). Pending before the court are Jordan's petition for a writ of habeas corpus (Doc. 1), Jordan's supplemental memorandum of points and authority (Doc. 40), Respondent A. Malfi's answer (Doc. 41), and Jordan's response to Malfi's answer (Doc. 54). For the reasons discussed, Jordan's application is DENIED.

I

    On March 5, 2003, Jordan was convicted by a Sacramento County Superior Court jury of two counts of murder (Cal. Penal Code § 187(a)); multiple murder circumstances (Cal. Penal Code § 190.2(a)(3)); and use of a firearm for each murder (Cal. Penal Code §§ 12022.5(a); 12022.53(b), (c), and (d)). Clerk's Transcript

(CT) at 363-65, 372-73.  Jordan was sentenced to, and is currently serving, an aggregate term of 90 years to life in prison.  CT 10, 475-76.

A

Jordan filed a direct appeal of the judgment of conviction with the California Court of Appeal, Third Appellate District.  In its decision affirming the judgment, the Court of Appeal summarized the relevant facts as follows:[1]

> [Jordan] and Timothy Traylor, who were so close they were like brothers, were both associated with the Nogales Crips gang.  [Jordan] was a member, but Traylor never did become a member.  On the afternoon of November 29, 2002, [Jordan] and Traylor walked to East Coast Fashion, a clothing store on Marysville Boulevard.  [Jordan] was wearing jeans and a white t-shirt.  While they were in the store, Hudson Augustus, who was known as "Artist," came into the store.  Shortly thereafter, [Jordan]'s girlfriend Tanaria Barkins and Tanaria's mother Dana Laws came into the store.
>
> Artist and his brother Gregory, also known as "Buckeye," were part of the Del Paso Heights Bloods, a rival gang to the Crips.  [Jordan] and Traylor made a purchase and were standing near the store's exit when Artist began addressing them in a disrespectful tone.  Artist said he and his brother were going to "whip" them.  Traylor thought a fight was about to go down.  He told Artist they did not want any problems and to keep it cool.
>
> Traylor walked out of the store onto the sidewalk and toward a nearby pizza parlor.  [Jordan] was right behind him, and Artist was already out on the sidewalk.  When they were in front of the pizza parlor, Buckeye pulled his car up and jumped out.  He ran up to Traylor and said something like, "what you, fuck you, talking about you don't want no problem."  Buckeye made a fist.  When Traylor saw Buckeye's fist, he thought Buckeye was going to hit him, so he dropped the bag of newly-purchased clothes he was carrying and prepared to defend himself in a fist fight.
>
> As soon as Traylor dropped the bag, gunshots went off.  The shots were so close to Traylor, he thought at first he had been hit.  He saw Buckeye and Artist fall to the ground.  He never saw [Jordan] after the gunshots.  Traylor ran to the pizza parlor, but the door was locked.  He yelled at them to call 911.
>
> Willie Vains, who saw the shooting, came up and told Traylor to call 911.  Traylor used his mother's cell phone to dial 911.  He was disconnected, so he called it again.  He talked to the 911 operator and said there had been a

---

[1]Since Jordan has not raised a challenge to their accuracy, the factual findings of the Court of Appeal are presumed correct . *See* 28 U.S.C. § 2254(e)(1).

2

shooting.[2]

Traylor saw Barkins and Laws come out of the clothing store. They went toward their car, where Laws's boyfriend, Alvin Williams, was waiting for them. Laws asked Traylor if he wanted a ride. He got in the car and they drove him home. While Traylor was in the car, the 911 operator called him back. When Traylor got out of the car, he crossed the street to see his cousin, Jibri Stepter. He told Stepter what had happened, and left the bag of clothes with Stepter before going across the street to his own house.

Traylor's mother came home, and he told her what had happened. About 30 to 45 minutes after the shooting he called [Jordan]. Both Traylor and his mother talked to [Jordan]. Traylor asked why [Jordan] had put him in such a bad position. [Jordan] said he got tired of fighting. After talking to [Jordan], Traylor's mother contacted the police, and Traylor went to the police station to be questioned.

Five eyewitnesses (other than Traylor and [Jordan]) testified. Willie Vains lived in the neighborhood and was a very close friend of the victims. As Vains was crossing the street to the pizza parlor, he saw the victims and two other men. One of the other men was Traylor, whom he described as a "tall dark skinned" man. He knew Traylor from the neighborhood, and recognized him because of his distinctive gold teeth. He was not friends with Traylor, but he knew him. Vains was a Blood and Traylor was a Crip, so he would not hang out with him. Vains testified the "shorter dude that was with Tim, he had braids, he pulled a gun out and shot Artist first." Then he shot Buckeye. The shooter ran away up Balsam. Traylor just stood there, hysterical. Vains testified the shooter had about the same complexion as Vains, or maybe a little lighter, and was wearing jeans and a white shirt. Vains remembered that Traylor had a bag in his hands, and remembered Traylor talking on the cell phone. Traylor stayed around five or six minutes, then he left.

Denise Wesley was another eyewitness. She heard the gunshots and saw a light-skinned person with a gun in his hand going north on Balsam.

James Crant, who was walking to a nearby car wash, heard the gunshots and saw a man in tan pants, a white t-shirt and black head scarf "squeezing the trigger away." The shooter was light-skinned, about 5 [sic] feet, seven or eight inches tall and weighed around 160 or 170 pounds. After the shooting, Grant saw the shooter walk around behind the pizza place down Balsam and disappear. Grant assumed the shooter got in a car and left.

Kenneth Williams was at the nearby carwash with his girlfriend Yakima Smith. Kenneth Williams talked to a police officer a few minutes after the shooting. He told the officer he saw a thin, medium-complexioned black male approximately five feet, eight inches tall wearing a white t-shirt and black or blue pants holding a gun in his outstretched hand. He said he saw

---

[2] The tape of this call was played to the jury. Phone records confirmed two calls to 911 were placed from Traylor's mother's cell phone within seconds of each other.

3

the man with the gun run north on Balsam. At trial Kenneth Williams claimed he had not seen any of this, and that his girlfriend, Smith, was the one who saw it. He testified he told the officer he had seen everything because Smith did not want to get involved.

Jess Green was a witness for the defense. He saw someone come around the corner of the pizza parlor and start shooting. The shooter was six feet tall and wearing a white shirt and dark pants. He was Black, and his skin color was kind of dark, but not real dark. After the shooting, the person ran around the pizza parlor to northbound Balsam with the gun in his hand.

Neither Alvin Williams nor his girlfriend, Dana Laws, saw the shooting take place. Alvin Williams was parked across the street from East Coast Fashion, and ducked down when he heard gunshots. Laws was inside East Coast Fashion with her daughter Tanaria Barkins, [Jordan's] girlfriend. At trial all three testified Traylor pushed his way into the car after the shooting. Traylor had testified Laws asked him if he wanted a ride home. When the prosecutor and his investigator told Williams they wanted to talk to him about the shootings, he told them he wanted nothing to do with it because he had people "bothering" him. While the prosecutor was talking to him Laws was screaming "stick to your story" and "you didn't see anything."

Barkins testified Traylor pulled something from his waist band and gave it to a boy who came to meet Traylor when they dropped him off. The person who met Traylor, Jibri Stepter, testified Traylor left a bag of clothes with him, but nothing else.

[Jordan] took the stand and testified he saw Traylor pull a gun out of his pocket and start shooting. [Jordan] ran as soon as the first shot went off. [Jordan] also produced as a witness Kenyatta Hudson, who testified he was acquainted with both Traylor and [Jordan]. Hudson testified that about a month after the shootings he had a telephone conversation with Traylor, and Traylor told him it was too "hot" for him because of what had just happened. However, Traylor did not tell Hudson he, rather than [Jordan], had done the shooting.

Lodged Doc. 2 (Opinion) at 2-7.

B

On March 29, 2005, the California Court of Appeal for the Third Appellate District affirmed Jordan's conviction on his direct appeal. Opinion at 2. Jordan's petition for rehearing of his case was denied on April 15, 2005. Lodged Doc. 2 (Denial). On April 2, 2005, Jordan sought review in the California Supreme Court. Doc. 1, appdx. 2. The California Supreme Court denied the petition on July 13, 2005. Doc. 1 at 3.

C

On July 19, 2006, Jordan filed an application for a writ of habeas corpus in

this court pursuant to 28 U.S.C. § 2254(a). Doc. 1. Malfi acknowledges that Jordan has exhausted his grounds for relief. Doc. 41 at 3.

II

A

Jordan's petition was filed after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under AEDPA, a federal court has limited power to grant habeas corpus relief. AEDPA provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision may result in a decision that is "contrary to" established federal law if it "applies a rule that contradicts the governing law set forth in our cases" or "confronts a set of facts that are materially indistinguishable from a decision of the Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). "[C]learly established Federal law" is defined as "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). The state court's decision may be "an unreasonable determination" if "the state court identifies the correct governing legal principle" but applies the principle unreasonably to the prisoner's factual situation. *Williams*, 549 U.S. at 413.

When the state court does not explain its reasoning for denying a habeas petition, the federal court "must conduct an independent review of the record to determine whether the state court's decision was objectively reasonable." *Sass v.*

5

*Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1127 (9th Cir. 2006). State court decisions may only be subject to federal habeas relief if they are unreasonable, not merely erroneous. *Early v. Packer*, 537 U.S. 3, 11 (2002).

B

Jordan's petition for habeas relief is subject to the AEDPA requirement that the prior state court decisions refusing his petition are unreasonable, that is, contrary to federal law, or an unreasonable determination of the facts. "In determining whether a state court decision is contrary to federal law, we look to the state's last reasoned decision," in this case, the opinion handed down by the California Court of Appeal on Jordan's direct appeal. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). The Court of Appeal addressed each of Jordan's claims in a reasoned opinion, which the court now reviews. *See* Opinion.

C

Jordan asserts that he is entitled to habeas corpus relief on six grounds. First, he argues that the trial court's reading of CALJIC 2.28, a jury instruction on evaluation of witnesses, unfairly penalized Jordan for his counsel's discovery violation. Second, he argues that his trial counsel's stipulation not to report the oral reading of jury instructions violated his due process rights and constituted ineffective assistance of counsel. Third, he argues that his trial counsel rendered ineffective assistance when he failed to object and move to strike the improperly admitted opinion of a lay witness concerning Jordan's guilt. Fourth, he argues that the trial court improperly excluded impeachment evidence directed against a key prosecution witness. Fifth, Jordan argues that the trial court imposed consecutive sentences rather than concurrent sentences for each of his convictions in violation of his Sixth Amendment rights. Sixth and finally, he argues that the enhancement imposed under § 12022.53 of the California Penal Code was not authorized by the jury's findings, and therefore violates his Sixth and Fourteenth Amendment rights to

6

a jury trial. Doc. 1. The court addresses each of these claims in this Order.

## III

### A

Jordan argues that the trial court's reading of CALJIC 2.28 was an improper discovery sanction that deprived him of due process. The trial court instructed the jury under CALJIC 2.28 to sanction defense counsel's discovery violation. Reporter's Transcript (RT) 730-31. Jordan's defense counsel had admittedly made a late disclosure of his intention to call Kenyatta Hudson as a witness, on the basis that he feared timely disclosure would endanger Hudson's life. RT 665. The trial judge read CALJIC 2.28 as follows to the jury when Hudson was called as a witness:

> The prosecution and the defense are required to disclose to each other before the trial the evidence that each intends to present at the trial so as to promote the ascertainment of the truth, to save the court time and avoid any surprise which may arise during the course of the trial. Concealment of evidence and/or delay in the disclosure of the evidence may deny a party a sufficient opportunity to subpoena necessary witnesses or produce evidence which may exist to rebut the complying [sic] parties evidence. Disclosure of evidence are [sic] required to be made at least 30 days in advance of trial. Any new evidence discovered within 30 days of trial must be disclosed immediately. In this case the defendant did either concealed [sic] or failed to timely disclose evidence consisting of written summary of an interview of this witness Kenyatta Hudson. Although the defendant [sic] failure to timely disclose the evidence was without lawful justification, the Court has, under the law, permitted the production of this evidence during the trial. The weight and significance of any delay in disclosure is a matter for your consideration. You should consider whether it [sic] untimely disclosed evidence pertains to a fact of importance to something trivial or to the subject matter already established by other credible evidence.

RT 783-84. The court then gave this instruction again on the conclusion of the case. CT 339-40.

Jordan argues that the instruction violated his rights by ascribing the discovery violation to Jordan personally, and inviting the jury to convict him on the basis of the discovery violation rather than the alleged facts. Accordingly, Jordan argues he was prejudiced. In its decision on direct appeal, the California Court of Appeal noted that two of its recent cases had accepted arguments similar to Jordan's

7

regarding the jury instruction at issue. However, the Court of Appeal distinguished the facts of *People v. Bell*, 12 Cal. Rptr. 3d 808 (Cal. Ct. App. 2004), and *People v. Cabral*, 17 Cal. Rptr. 3d 456 (Cal. Ct. App. 2004), finding that the defendants in those cases were prejudiced as a result of the jury instruction, but in Jordan's case "it is not reasonably probable [Jordan] would have achieved a more favorable result had the court not given CALJIC No. 2.28." Opinion at 10.

Federal law, as established by the Supreme Court at the time of Jordan's case, requires a finding that a trial error "'had substantial and injurious effect or influence in determining the jury's verdict'" before habeas relief can be granted. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Trial errors are defined as those that "occur[] during the presentation of the case to the jury," and "may therefore be quantitatively assessed in the context of other evidence presented" to determine its effect on the trial. *Arizona v. Fulminante*, 499 U.S. 279, 307-08 (1991). Such errors are treated differently than "structural defects in the constitution of the trial mechanism," which infect the entire trial process and cannot be individually assessed. *Id.* at 309. The alleged error here, a single jury instruction, is properly categorized as a trial error rather than a structural defect, because it occurred during presentation of the case to the jury and may be assessed in the context of the evidence presented.

The Court of Appeal denied Jordan's direct appeal after reviewing this claim for prejudice, finding that it was not "reasonably probable" that Jordan would have a achieved "a more favorable result" absent the trial error. Opinion at 10. This standard for harmless error is not contradictory to the federal standard for harmless error, which requires a showing that the error "had substantial or injurious effect or influence in determining the jury's verdict." *Kotteakos*, 328 U.S. at 776. Nor did the state court's decision on this point apply the facts of this case unreasonably. Although Hudson's testimony was exculpatory in that it indicated Traylor was the shooter, rather than Jordan, it was contradicted by four other eye-witnesses who

identified the shooter as having light to medium skin and fleeing the scene immediately after the shooting. The record indicates that Traylor has dark skin and remained at the scene for several minutes after the shooting, calling 911 twice. In light of this evidence, the state court was not unreasonable in ruling that it was not reasonably probable that the faulty jury instruction changed the jury's verdict. Because the error did not substantially influence the jury's verdict, Jordan is not entitled to habeas relief on this ground.

B

Jordan's second argument is that his counsel's agreed stipulation that the oral reading of jury instructions need not be reported in the record constituted ineffective assistance of counsel. At the conclusion of the instructions conference, defense counsel stipulated along with the prosecution that the court's oral reading of the jury instructions it had submitted in written form to the jury need not be recorded as part of the trial transcript. RT 1043-45. Consequently, the final record of the trial does not include a transcript of this oral rendition. Jordan argues that, as a result, he has been denied the opportunity to review those instructions for accuracy on appeal, and that his attorney's failure to preserve the oral reading of the instructions for appeal was ineffective assistance of counsel.

The California Court of Appeal ruled on this argument in conjunction with Jordan's claim that trial counsel rendered ineffective assistance when he failed to object and move to strike the improperly admitted opinion of a lay witness as to Jordan's guilt. The California Court of Appeal ruled that Jordan could not prevail on either claim of ineffective assistance of counsel because he had not shown that the allegedly deficient performance resulted in prejudice. Opinion at 12. The court concluded that even assuming Jordan's counsel's stipulation to forego transcription of the oral jury instructions was deficient performance, there is no evidence that Jordan was prejudiced. Absent affirmative evidence that the trial court made a mistake in reading the jury instructions, the court declined to assume error. *Id.*

Similarly, as discussed in further detail below, the court declined to find ineffective assistance of counsel because there could have been tactical explanations for the failure to object. *Id.*

As the Supreme Court has indicated, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on a claim for ineffective assistance of counsel, a defendant must first show his "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and then "that the deficient performance prejudiced the defense." *Id.* at 687. In cases such as this where there is no more specific authority on whether counsel's actions constituted ineffective assistance of counsel, the court must recur to the *Strickland* standard. *Knowles v. Mirzayance*, 2009 LEXIS 2329 at *23, No. 07-1315 (U.S. March 24, 2009).

Even if Jordan could successfully prove that his trial counsel's stipulation not to record the court's oral rendition of the jury instructions was error, he could not prevail on his claim without a showing that this error prejudiced his case. As the Court of Appeal found, Jordan has presented no evidence of prejudice, only a vague suggestion that something might have been found had the reading been recorded, an error that presumably his counsel failed to catch during presentation of the jury instructions themselves. The Court of Appeal's rejection of this claim was not unreasonable.

C

Jordan argues that he was denied effective assistance of counsel when his trial counsel failed to object to Detective Husted's direct examination testimony that Traylor was a credible witness and not the shooter. Jordan's counsel did object to the government's follow up question asking why Husted did not believe Traylor was

guilty.

In denying Jordan's appeal on this ground, the Court of Appeal wrote that:

> mere failure to object to evidence rarely establishes counsel's incompetence because it usually involves tactical decisions on counsel's part. It is possible counsel did not object earlier because he did not wish to draw attention to Husted's testimony or to appear antagonistic, or he may have simply felt Husted's testimony on the matter was unimportant.

Opinion at 13.

In evaluating counsel's performance for the purposes of determining ineffective assistance of counsel, the court must "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. The court should also note that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Under this standard of review, the court cannot say that the Court of Appeal's ruling was unreasonable. Established federal law gives broad deference to defense counsel's tactical decision making and applies a presumption of adequate assistance. Accordingly, this argument also fails.

D

Jordan argues that the trial court committed reversible error by preventing him from impeaching Vains with Vains's prior felony conviction. During Vains's cross-examination, Jordan's counsel asked him if he had previously been convicted of any felonies. Before Vains could complete his answer, the government objected and the trial judge sustained the objection. RT 175. When defense counsel persisted in that line of questioning, he was rebuked by the trial judge. RT 176. After Vains finished testifying, and outside the presence of the jury, the trial court further admonished defense counsel for his "attempts to impeach the witness with a felony conviction that [he knew] full well is inadmissible." RT 180. Jordan argues that the trial court erroneously excluded the statement on the belief that

11

impeachment is impermissible unless approved in advance. He cites as support the trial court's rebuking statement that "[he] didn't ask for permission to impeach the witness with that conviction." RT 180.

The Court of Appeal rejected Jordan's characterization of the trial court's ruling. It found that, although "[t]he record is silent as to why the trial court believed the prior conviction was inadmissible," it could have been because the conviction fell within one of the exceptions enumerated in California Evidence Code § 788 (conviction has been pardoned, certificate of rehabilitation granted, or witness has otherwise been relieved of penalties), or properly excluded pursuant to § 352 for being more prejudicial than probative, unduly time consuming, confusing, or creating a substantial danger of misleading the jury. Opinion at 14-16. The Court of Appeal declined to assume that the prior conviction was omitted for an improper reason in absence of evidence in the record indicating error. *Id.* at 16.

The right to cross-examine a witness is protected by the Sixth Amendment, and denial of that right is reversible error, with no need to show prejudice. *Davis v. Alaska*, 415 U.S. 308, 318 (1974). However, "'[t]he right to present relevant testimony is not without limitation.'" *Michigan v. Lucas*, 500 U.S. 145, 149 (1998) (quoting *Rock v. Arkansas*, 483 U.S. 44, 55 (1987)). Trial judges have wide latitude "to impose reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

The Court of Appeal was not unreasonable in rejecting Jordan's argument that the trial court excluded the evidence under the erroneous belief that Jordan needed prior permission to impeach a witness. There is no evidence in the record to support such a conclusion other than one clause of the trial court's rebuke to Jordan's trial counsel, taken out of context. Given the wide latitude trial judges have when ruling on the admissibility of cross-examination, the Court of Appeal was

also not unreasonable in concluding that the trial court's ruling was not reversible error.

E

Jordan claims that the trial court's imposition of consecutive sentences rather than concurrent sentences violated his Sixth Amendment rights, because it increased the length of his sentence beyond the statutory maximum without a jury finding of additional justifying facts. The California Penal Code requires the judgment of conviction for two or more crimes to specify whether the terms of imprisonment for the multiple convictions will run concurrently or consecutively. Cal. Pen. Code. § 669. If the court fails to specify, the terms of imprisonment will run concurrently. *Id.* Under California law, Jordan asserts, the imposition of consecutive terms requires the support of expressly identified aggravating facts. *See People v. Leung*, 7 Cal. Rptr. 2d 290, 303 (Cal. Ct. App. 1992) ("In choosing between consecutive and concurrent terms, the court must decide whether the particular circumstances at issue renders the collective group of offenses distinctively worse than the group of offenses would be were that circumstance not present."). Jordan alleges the trial court violated the Sixth Amendment by relying on its own factfinding to impose the consecutive sentences.

The Court of Appeal rejected Jordan's claim that his consecutive sentences represented an upward deviation from the sentencing norm in violation of the Sixth Amendment, as found by the Supreme Court in *Blakely v. Washington*, 542 U.S. 296, 303-04 (2004) (holding that a trial court judge may not impose a sentence above the statutory minimum, defined as "the maximum sentence a judge may impose . . . *without* any additional findings"). The Court of Appeal reasoned that "section 669 does not direct the court to impose concurrent or consecutive sentences, nor does it require any particular finding before consecutive sentences may be imposed." Opinion at 27. It noted further,

[w]hile there is a statutory presumption in favor of the middle term as the

13

> sentence for an offense, there is no comparable statutory presumption in favor of concurrent rather than consecutive sentences for multiple offenses except where consecutive sentencing is statutorily required. The trial court is required to determine whether a sentence shall be consecutive or concurrent but is not required to presume in favor of concurrent sentencing.

*People v. Reeder*, 200 Cal. Rptr. 479, 495 (Cal. Ct. App. 1984) (internal citation omitted). Therefore, because there is no right to concurrent sentences, the statutory maximum in any case is "an aggregate consecutive term. Thus, when the court exercises its discretion to impose a consecutive sentence, the defendant has no right to a jury determination of the facts the court deems relevant to that determination." Opinion at 28.

It is established federal law that "state courts are the ultimate expositors of state law, and that we are bound by their constructions except in extreme circumstances," as when the state court interpretation is "an 'obvious subterfuge to evade consideration of a federal issue.'" *Mullaney v. Wilbur*, 421 U.S. 684, 691, n.11 (1975) (quoting *Radio Station WOW, Inc. v. Johnson*, 326 U.S. 120, 129 (1945)) (internal citations omitted). The Court of Appeal's interpretation of California Penal Code § 669 is therefore entitled to federal deference absent any evidence that the interpretation is meant to evade consideration of a federal issue.

The Court of Appeal acknowledged that trial judges are expected to provide justification for imposing consecutive sentences over concurrent sentences, but notes that neither the statute nor the rules of the court compel a specific result in any delineated circumstances. Opinion at 27. In that respect, judicial discretion in imposing consecutive or concurrent terms is distinguishable from decisions going beyond the Federal Guidelines' provisions subject to *United States v. Booker*, 543 U.S. 220 (2005). The Court of Appeal concluded that "[t]he *Blakely* line of cases does not prohibit judicial fact-finding in the exercise of discretion to impose a sentence within the statutory maximum range." Opinion at 28. This conclusion is not an unreasonable application of federal law, which, at the time of the Court of

14

Appeal's opinion, had not yet applied the reasoning of *Blakely* and *Booker* to the decision of concurrent or consecutive terms.

Jordan's reference to *Oregon v. Ice*, in which the Supreme Court ultimately addressed the issue, is unhelpful to his cause, since the Court concluded in that case that "[t]he decision to impose sentences consecutively is not within the jury function" covered under the *Blakely* line of cases, and that the Sixth Amendment's restriction on judge-found facts does not apply to imposition of concurrent or consecutive sentences. 129 S.Ct. 711, 718 (2008). Because AEDPA requires review of the state court decision on the basis of federal law established at the time of that decision, *see Andrade*, 538 U.S. at 71, the court merely notes that the ruling in *Ice* supports the conclusion that the Court of Appeal's interpretation of federal law was not an unreasonable application of that law.

F

Jordan's final argument in support of his petition for habeas corpus is that he was improperly sentenced for a firearms enhancement which was not actually found by the jury. Established federal law holds that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). Jordan was charged with a sentencing enhancement on the ground that he used a firearm in the course of a felony in violation of California Penal Code § 12022.53(b), (c), and (d). Subsection (b) imposes a consecutive 10 year enhancement for personally using a firearm in the commission of a felony, subsection (c) imposes a consecutive 20 year term for personally and intentionally discharging the firearm, and subsection (d) imposes a consecutive term of 25 years to life for personally and intentionally discharging a firearm and proximately causing great bodily injury to any person other than an accomplice.

As the Court of Appeal observed, "[t]he trial court instructed the jury pursuant to the language of subdivision (d) of section 12022.53. However, for

15

reasons unknown the verdict form completed and signed by the jury foreperson and to which the entire jury attested was limited to the language of subdivision (b)." Opinion at 28-29. In acknowledging the trial court's error in imposing the enhanced sentence found in (d) despite the jury's limited finding, the Court of Appeal declined to reverse the sentence on the basis that the error was harmless. The Court of Appeal interpreted *Apprendi*, and its prodigy to allow for harmless error review, and only require reversal when it could not be "shown beyond a reasonable doubt that the error was harmless." It further reasoned that, in finding Jordan guilty of the two murders,

> the jury must necessarily have found [that he] discharged the gun and killed the victims. The jury clearly found [Jordan] caused the death of the victims when it found [him] guilty of their murder. There was no evidence this was a case in which [Jordan] beat the victims to death with the butt of the gun, or caused their death in any way other than by discharging the bullets from the gun into their bodies.

Opinion at 29-30. Jordan challenges the Court of Appeal's ruling on the argument that harmless error analysis does not apply in case such as this, where, he argues, "the error is structural, and requires reversal per se." Doc. 54 at 15.

Established federal law in effect at the time of the Court of Appeal's decision acknowledged that not all constitutional errors require automatic reversal; in fact, all trial errors aside from structural defects are subject to harmless-error standards. *Fulminante*, 499 U.S. at 306, 309 (the Court adopts the "general rule that a constitutional error does not automatically require reversal of a conviction," rather "most constitutional errors can be harmless"); *see also United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004) ("It is only for certain structural errors undermining the fairness of a criminal proceeding as a whole that even preserved error requires reversal without regard to the mistake's effect on the proceeding."). The error alleged in this case is not clearly "structural," in the way that total deprivation of counsel, the right to self-representation, a biased judge, and a jury that excludes members of the juror's race are errors "affecting the framework within which the

16

trial proceeds." *Fulminante*, 499 U.S. at 309-10.

In light of the highly deferential standard required by AEDPA, the state court's conclusion that the error was subject to harmless error review was not unreasonable. In addition, the state court was not unreasonable in concluding that the error was harmless. The jury must have concluded that Jordan shot the victims in order to find him guilty of murder, therefore the corresponding enhancement is appropriate.

## CONCLUSION

Accordingly, it is hereby ORDERED that Jordan's application for a writ of habeas corpus is DENIED. The Clerk is directed to enter judgment and close the case.

DATED: April 9, 2009

/s/ Milan D. Smith, Jr.
UNITED STATES CIRCUIT JUDGE
Sitting by Designation